**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 04-1490**

————————

CONTINENTAL CASUALTY COMPANY,

Plaintiff - Appellee,

versus

PENN NATIONAL INSURANCE COMPANY,

Defendant - Appellant.

————————

Appeal from the United States District Court for the District of South Carolina, at Charleston.  C. Weston Houck, Senior District Judge. (CA-01-3117-2-12)

————————

Argued:  March 16, 2005          Decided:  April 19, 2005

————————

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

————————

Affirmed in part; reversed in part; and remanded by unpublished per curiam opinion.

————————

**ARGUED:**  Frank Barron Grier, III, West Columbia, South Carolina, for Appellant.  William Jefferson Leath, Jr., LEATH, BOUCH & CRAWFORD, L.L.P., Charleston, South Carolina, for Appellee.  **ON BRIEF:** Jeanette F. Barber, GRIER LAW FIRM, L.L.C., West Columbia, South Carolina, for Appellant.

————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

This appeal from a declaratory judgment concerns a dispute as to coverage under three insurance policies for $2.5 million in damages arising out of an automobile accident. For the reasons that follow, we conclude that Penn National Insurance Company is liable under its business auto coverage policy for the first $1 million in damages arising from the accident, and that Continental Casualty Company is liable under its business auto coverage policy for the remaining $1.5 million. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

The parties stipulated to the following facts. On August 1, 1997, David Breu, an employee of Allied Steel Corporation, was working a second job as a delivery man for a Pizza Hut located in North Charleston, South Carolina. With Allied Steel's permission, Breu was using a car owned by Allied Steel to perform his delivery route. While delivering pizzas that evening, Breu ran a red light and struck the car of Russell Bernard, a North Charleston police officer who was off duty at the time. The accident injured Bernard.

On January 28, 1999, Bernard and his wife Sharon brought companion suits against Pizza Hut and Breu. Breu sued for his

2

injuries and Sharon Breu sued for loss of consortium.  Allied Steel was not a party to either action.  In February of 2001, Continental (which insured Pizza Hut and various other Pepsico, Inc. subsidiaries in 49 states), on behalf Pizza Hut only, and Penn (which insured Allied Steel), on behalf of Breu only, settled with the Bernards for $2.5 million.  Of this sum, Continental paid $1.75 million and Penn paid $750,000, though both insurers reserved the right to contest this distribution.

On March 20, 2001, Continental filed a declaratory judgment action against Penn in South Carolina state court seeking to determine each party's rights under the three policies in effect at the time of the accident:  Penn's business auto coverage policy, which provided Allied Steel with up to $1 million in liability insurance;  Continental's business auto coverage policy, which provided Pizza Hut with up to $5 million in liability insurance; and Penn's umbrella policy, which provided Allied Steel with additional insurance of up to $1 million.  Penn subsequently removed the case to federal court.

After a bench trial, the district court ruled that: (1) Penn is primarily liable under its business auto coverage policy for the first $1 million in damages arising out of the accident as well as for Breu's defense costs; (2) Penn is liable under its umbrella policy for the next $1 million in damages arising out of the accident; and (3) even though Breu was insured under Continental's

3

policy at the time of the accident, the vehicle he was driving was not covered and, therefore, Continental provided "no liability coverage for the accident and was under no duty to defend Mr. Breu as a result thereof."[1]  Penn timely appealed.  We review the district court's findings of fact for clear error and its conclusions of law de novo.  Williams v. Sandman, 187 F.3d 379, 381 (4th Cir. 1999).

II.

Before addressing the substantive questions involved, we briefly describe how the three insurance policies at issue function.

The business auto coverage policies function identically. Each contains a "Declarations" page that indicates a "liability" code number.  This code number corresponds to a description provided in Section I, "Covered Autos."  Thus, in this case, both policies provide liability coverage for "any 'auto.'"  Each policy also contains a "Definitions" section -- Section V in both policies -- that defines various relevant terms.

In addition, both business auto coverage policies define -- in Section II, "Liability Coverage" -- what "coverage" is and "who is an insured."  With respect to "coverage," both policies state:  "We

---

[1]Although defense costs were at issue below, Penn has not raised any issue as to them on appeal, and we therefore do not consider defense costs.

4

will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'"

Each policy also includes -- in Section IV, "Business Auto Conditions" -- an "other insurance" clause, which determines the conditions under which the policy will be considered "primary" or "excess." Penn's and Continental's "other insurance" clauses are identical. They provide in relevant part: "For any covered 'auto' you own, this Coverage Form provides primary insurance. For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance." Relevant to this case, Continental's policy also includes several "Endorsements" that amend the policy.

Penn's umbrella policy differs in substance from the business auto coverage policies in that it provides coverage only when the applicable underlying limit -- in this case, Penn's business auto coverage policy's $1 million limit -- is insufficient to cover resulting damages, and it provides coverage only for those damages in excess of that underlying limit. The umbrella policy operates similarly to the other policies, however, in that it contains a "coverage" section, a section defining "who is an insured," an "other insurance" clause, and a "definitions" section.

5

III.

The first substantive question we consider is whether the district court correctly concluded that Continental provided "no liability coverage" in this case.

Under South Carolina law, insurance policies are subject to the general rules of contract construction:

> A court must give policy language its plain, ordinary, and popular meaning. An insurer's obligation under a policy of insurance is defined by the terms of the policy and cannot be enlarged by judicial construction. However, where present, ambiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer.

Sunex Int'l, Inc. v. Travelers Indemnity Co., 185 F. Supp. 2d 614, 617 (D.S.C. 2001) (citations omitted); accord Poston v. Nat'l Fidelity Life Ins. Co., 399 S.E.2d 770, 772 (S.C. 1990) ("Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." (internal quotations marks and citation omitted)).

The district court noted that Continental's policy "listed a number of vehicles as 'covered auto,' but the vehicle being operated by Mr. Breu on August 1, 1997 was not listed." The court also noted that "[n]owhere in [Continental's] policy is 'covered automobile' defined so as to include one not owned by an employee but being operated by an employee about the business of Pizza Hut." On the basis of these facts, the court concluded that "[t]he

6

vehicle that Mr. Breu was driving at the time of the accident was not a covered vehicle under [Continental's] policy," and, as a result, Continental "provided no liability coverage for the accident."

Though we accept the facts noted by the district court, we cannot accept its ultimate conclusion. First, the plain language of Continental's business auto coverage policy strongly indicates that both Breu and the vehicle he was driving were covered under that policy. It is undisputed that Breu was "an insured" under the policy. Endorsement 8 amended the definition of "who is an insured" to include "any employee . . . while acting 'within the scope of [his] duties' to [Pizza Hut]," and Endorsement 19 provides that "[a]ny employee of [Pizza Hut] is an 'insured' while using a covered 'auto' [Pizza Hut] do[esn't] own, hire or borrow in [its] business or [its] personal affairs." Neither the district court nor Continental points to any language in Continental's policy providing that in order for an "insured" to be entitled to liability coverage, his specific vehicle must be listed in the policy. Indeed, given that Continental's policy covers Pizza Hut and various other subsidiaries of Pepsico, Inc. in 49 states, such a requirement would likely preclude coverage in many otherwise deserving cases.

Furthermore, nowhere in Continental's policy is "covered auto" defined so as to exclude a vehicle not owned by a Pizza Hut

7

employee that is used in the scope of that employee's employment. In fact, to the contrary, Continental's policy, like Penn's, explicitly states that "<u>any</u> 'auto'" is a "covered auto" for purposes of liability insurance. Absent any contrary indication, "any" auto must include Breu's.

Nevertheless, Continental contends that Endorsement 20 narrows the scope of "covered autos" so as to exclude from coverage any non-employee-owned vehicles. <u>See</u> Brief of Appellee at 20. Endorsement 20, styled a "[d]escription of 'Auto[,]'" provides: "Any employee owned vehicle <u>only</u> while the employee is working on the clock for Pizza Hut, Inc. and operating such vehicle on behalf of Pizza Hut, Inc." The Endorsement further states: "Any 'auto' described in the Schedule will be considered a covered 'auto' [Pizza Hut] own[s] and not a covered 'auto' [Pizza Hut] hire[s], borrow[s] or lease[s] under the coverage for which it is a covered 'auto.'"

Continental's reading of Endorsement 20 is at odds with the text's plain language. Endorsement 20 does not purport to limit the definition of "auto" provided in Section V, i.e., "a land motor vehicle, trailer or semitrailer designed for travel on public roads." Rather, as the policy specifically states, Endorsement 20 merely clarifies that when a Pizza Hut employee is using his own vehicle in the course of his employment, that vehicle "will be considered a covered 'auto' [Pizza Hut] own[s] and not a covered

8

'auto' [Pizza Hut] hire[s], borrow[s] or lease[s] . . . ."[2]  In other words, Endorsement 20 seeks only to clarify that, for liability purposes, an employee who uses his own vehicle on the job will be treated identically to an employee who uses a vehicle owned by Pizza Hut.  In short, contrary to Continental's contention, Endorsement 20 does not, under any reasonable interpretation, make "clear" that for coverage to extend to an employee, "the vehicle must be 'employee owned[.]'"  See Brief of Appellee at 20.  And, even if Endorsement 20 were capable of "two reasonable interpretations," which it is not, we would be required to adopt the construction "most favorable to the insured."  See Poston, 399 S.E.2d at 772.

Thus, under the plain language of Continental's policy, and because we must resolve any ambiguity in favor Breu, we conclude that Continental provided liability coverage to Breu.


IV.

Concluding as we have that Continental's policy provides liability coverage, we must now decide which of the two business auto coverage policies provides primary coverage.  Penn argues, largely on the basis of parol evidence, that Continental provides

---

[2]As this case demonstrates, the distinction between a "covered 'auto' [Pizza Hut] own[s]" and a "covered 'auto' [Pizza Hut] do[esn't] own" is significant under the "other insurance" clauses of both Continental's and Penn's policies for determining which policy provides primary coverage.  See infra Part IV.

9

"sole primary coverage," and, in the alternative, that Penn and Continental provide "co-primary coverage." Brief of Appellant at 21, 28. Because the clear language of the policies requires the conclusion that Penn's coverage is primary, these arguments fail.

It is hornbook law that when the terms of a written instrument are unambiguous, parol evidence is inadmissible. E.g., Proffitt v. Sitton, 136 S.E.2d 257, 259 (S.C. 1964). In this case, the policies are clear and unambiguous as to which one is primary and which one is excess. Both policies contain an identical "other insurance" clause, which provides: "For any covered 'auto' you own, this Coverage Form provides primary insurance. For any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance." It is undisputed that Allied Steel owned the vehicle Breu was driving at the time of the accident and that Breu was driving it with Allied Steel's permission. It is therefore clear that Penn is the primary insurer. This conclusion is bolstered by the "general rule" in South Carolina that "when two policies extend coverage to the operation of a vehicle, the policy insuring the liability of the owner of a described vehicle has the first and primary obligation." N.C. Farm Bureau Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 403 S.E.2d 151, 152 (S.C. Ct. App. 1991).

Attempting to escape the reality of its primary obligation, Penn points to South Carolina's "total policy insuring intent"

10

rule.  That rule provides that in some cases, when two policies both contain "excess" clauses, those clauses "should cancel each other out," and the court should determine, through analysis of several factors, the "total policy insuring intent."  S.C. Ins. Co. v. Fidelity and Guaranty Ins. Underwriters, Inc., 489 S.E.2d 200, 204 (S.C. 1997).  Penn then relies on parol evidence tending to show that Pizza Hut's intent was to provide primary car insurance to its delivery men.  See Brief of Appellant at 16-21, 23, 26-27.

The fatal flaw in this argument is that the "total policy insuring intent" rule only applies when "it is impossible to give effect to both 'excess' clauses" because they contradict each other, Fidelity, 489 S.E.2d at 205, which, as explained above, is not the case here.  See S.C. Farm Bureau Mut. Ins. Co. v. S.E.C.U.R.E. Underwriters Risk Retention Group, 578 S.E.2d 8, 11 (S.C. 2003) (holding that where two "other insurance" clauses "are not mutually repugnant, it [is] unnecessary to apply the 'total policy insuring intent' rule to allocate priority between the two carriers").  Thus, because the plain language of the policies dictates that Penn is the primary insurer, we conclude, notwithstanding any parol evidence, that Penn is liable for the first $1 million in damages arising from the accident between Breu and Bernard.

11

V.

The question remains whether Continental's policy or Penn's umbrella policy is next in line.

Penn's umbrella policy provides: "We will pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally obligated to pay as damages because of" bodily and other injury "to which this insurance applies . . . ." Qualifying this grant of coverage is the umbrella policy's "other insurance" clause, which provides: "If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will not make any payments until the other insurance has been used up. This will not be true, however, if the other insurance is specifically written to be excess over this policy."

Penn does not dispute that, but for Continental's policy and its umbrella policy's "other insurance" clause, its umbrella policy would provide coverage after exhaustion of primary insurance. Indeed, the umbrella policy clearly indicates that Penn's primary policy is the applicable underlying policy, and (according to Penn) the umbrella policy specifically lists Breu's vehicle. Thus, if Continental provided no liability coverage in this case and the umbrella policy's "other insurance" clause did not apply, Penn would be liable under its umbrella policy for $1 million in excess damages -- that is, the "ultimate net loss" up to its policy limit,

12

which is $1 million, in excess of the "applicable underlying limit," which is also $1 million.

It is a general principle of insurance law, however, that "umbrella policies are regarded as excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or any escape clauses" because "umbrella policies are not an attempt by a primary insurer to limit a portion of its risk by labeling it 'excess' nor a device to escape responsibility." 15 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 220:41, at 220-51 (1999). Moreover, we have adopted a similar approach, i.e., that, absent a contrary state rule, "where purported conflicts exist between an umbrella policy and an essentially primary policy made excess by a non-ownership clause" -- precisely the case here -- "the umbrella policy need not contribute until after the primary and ordinary excess coverages are exhausted." Allstate Ins. Co. v. Am. Hardware Mut. Ins. Co., 865 F.2d 592, 594 (4th Cir. 1989).[3]

Of course, our Allstate rule would not apply in the face of contrary state law. But South Carolina, which has noted that umbrella policies are "fundamentally different" from primary policies, Todd v. Federated Mut. Ins. Co., 409 S.E.2d 361, 365

---

[3]Although Continental states that its policy was "specifically written" to be excess over Penn's umbrella policy, Brief of Appellee at 18, it points to no policy language other than the generic "other insurance" clause to support this contention; we therefore find it unpersuasive.

13

(S.C. 1991), has never recognized a different rule.  And, given that the Allstate rule is in line with the 'overwhelming weight of authority,' Allstate, 865 F.2d at 595, it seems unlikely that South Carolina courts would adopt a contrary rule.

Continental argues that the Allstate rule "does not apply here since the unrefuted language of the Umbrella Policy provides coverage for the Allied-owned vehicle."  Brief of Appellee at 19. But, as in Allstate, the issue is not whether the umbrella policy would provide coverage if it were the only policy available; it is instead whether "the primary and ordinary excess coverages [have been] exhausted."  Allstate, 865 F.2d at 594.  Furthermore, the Allstate rule works no injustice in this case.  Breu's accident occurred during the course of his employment for Pizza Hut, so there is nothing inequitable about Pizza Hut's insurer bearing a portion of the liability for resulting damages. Cf. Allstate Ins. Co. v. Employers Liability Assurance Corp., 445 F.2d 1278, 1283-84 (5th Cir. 1971) (weighing five considerations in holding that primary insurance limits must be exhausted before umbrella policy kicks in -- relied upon by Fourth Circuit in Allstate, 865 F.2d at 594).

VI.

For the foregoing reasons, we conclude that Penn is primarily liable for the first $1 million in damages arising from the accident between Breu and Bernard and that Continental is liable for the remaining $1.5 million in damages.[4]  Thus, the judgment of the district court is

AFFIRMED IN PART;
REVERSED IN PART;
AND REMANDED.

---

[4]Since Continental's policy limit is high enough to cover the $1.5 million in remaining damages, Penn bears no liability under its umbrella policy.  However, since Continental paid $1.75 million toward the settlement, and Penn paid $750,000, Penn remains liable to Continental in the amount of $250,000.